OA 91    Criminal Complaint

# United States District Court

FILED

NORTHERN    DISTRICT OF    CALIFORNIA

2008 JUN 2 P 1:45

UNITED STATES OF AMERICA
V.

SEALED BY ORDER OF THE COURT

(1) Truc Quoc LE;  (2) Thuy DANG;  (3) Leo Le NGUYEN;
(4) Glenn LENGSAVATH;  (5) Ha Vanthi VU, a/k/a Tiffany VU;
(6) Thanh LE;  (7) Tien LE;  (8) Johanna RODRIGUEZ;
(9) Elena OBANDO, a/k/a Carmen GUTIERREZ;
(10) Manuel GUTIERREZ;  (11) Juan ESPINOZA, a/k/a Freddy
NAVARRO

(Name and Address of Defendant)

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

CRIMINAL COMPLAINT

Case Number:

## 08-70318 PVT

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my

knowledge and belief. On or about 12/8/2005 through 5/20/2008  in  Santa Clara  County, in

the  Northern  District of  California  defendant(s) did,

(Track Statutory Language of Offense)

conspire to commit an offense against the United States, to wit, a violation of 18 U.S.C. 2314, in that the defendants, and each of them, did agree to transport in interstate commerce merchandise of a value of $5,000 and more, knowing the same to have been stolen, converted, and taken by fraud; and that, in furtherance of the conspiracy, one and more conspirators committed the following overt acts: (1) on or about March 15, 2007, Leo Nguyen delivered a pallet of stolen Oil of Olay products to Lynden Air Freight in Burlingame, California, to be shipped to a vendor in Utah; and (2) on May 20, 2008, Thanh Le met Carmen Gutierrez in Glendale, California, and paid her over $107,000;

in violation of Title  18  United States Code, Section(s)  371 and 2314  .

I further state that I am a(n)  Task Force Agent, FBI  and that this complaint is based on the
Official Title

following facts:

SEE ATTACHED AFFIDAVIT OF JOHN BARG

PENALTIES: up to 5 years imprisonment, $250,000 fine, 3 year TSR, $100 SAF

REQUESTED BAIL: No Bail (Government Will Request Detention)

REQUESTED PROCESS: Arrest Warrant for each named defendant

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

Approved
As To
Form:
_____
AUSA

_____
Name/Signature of Complainant    #3640

Sworn to before me and subscribed in my presence,

June 2, 2008
Date

at  SAN JOSE, CALIFORNIA
City and State

PATRICIA V. TRUMBULL    United States Magistrate Judge
Name & Title of Judicial Officer

Patricia V. Trumbull
June 2, 2008
Signature of Judicial Officer    PVT

DOCUMENT NO.          CSA's
INITIALS

DISTRICT COURT
CRIMINAL CASE PROCESSING

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, John L. Barg, do swear and affirm as follows:

### Introduction

1.    I make this affidavit in support of each of the following arrest and search warrants:

### Arrest Warrants

a.    Arrest warrant for Truc Quoc LE, born July 27, 1968, who resides at 2166 Wood Hollow Court, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that LE is guilty of interstate transportation of stolen property ("ITSP"), money laundering, and conspiracy to commit both of those offenses.

b.    Arrest warrant for Thuy DANG, born September 28, 1967, who resides at 2166 Wood Hollow Court, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that DANG is guilty of conspiracy to commit ITSP, as well as money laundering, structuring of financial transactions, and conspiracy to commit money laundering.

c.    Arrest warrant for Leo Le NGUYEN, a/k/a Thuan Nguyen, born May 16, 1973, who resides at 3812 Rouen Court, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that NGUYEN is guilty of ITSP, money laundering, and conspiracy to commit both of those offenses.

d.    Arrest warrant for Glenn LENGSAVATH, born January 13, 1969, who resides at 167 Knightshaven Way, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that LENGSAVATH is guilty of ITSP, money laundering, and conspiracy to commit both of those offenses.

e.    Arrest warrant for Ha Vanthi VU, a/k/a "Tiffany VU," born May 30, 1977, who resides at 167 Knightshaven Way, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that TIFFANY VU is guilty of conspiracy to commit ITSP and money laundering.

f.    Arrest warrant for Thanh LE, born June 26, 1995, who resides at 2166 Wood Hollow Court, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that LE is guilty of ITSP and conspiracy to commit ITSP.

g.    Arrest warrant for Tien LE, born July 9, 1963, who resides at 33633 6th Street, Union

City, California. The facts set forth in this affidavit establish that there is probable cause to believe that LE is guilty of ITSP and conspiracy to commit ITSP.

h.      Arrest warrant for Johanna RODRIGUEZ, born March 10, 1980, who resides at 11313 Oxnard Street #101, North Hollywood, California. The facts set forth in this affidavit establish that there is probable cause to believe that RODRIGUEZ is guilty of ITSP and conspiracy to commit ITSP.

i.      Arrest warrant for Elena Obando, a/k/a Carmen GUTIERREZ, born January 13, 1977, who resides at 4446 3/4 Burns Avenue, Los Angeles, California 90057. The facts set forth in this affidavit establish that there is probable cause to believe that GUTIERREZ is guilty of ITSP and conspiracy to commit ITSP.

j.      Arrest warrant for Manuel GUTIERREZ, born February 2, 1961, who resides at 816 South Park View, Los Angeles, California 90057. The facts set forth in this affidavit establish that there is probable cause to believe that GUTIERREZ is guilty of ITSP and conspiracy to commit ITSP.

k.      Arrest warrant for Juan Espinoza, a/k/a Freddy Navarro, born January 12, 1979, who resides at 816 South Park View, Los Angeles, California 90057. The facts set forth in this affidavit establish that there is probable cause to believe that ESPINOZA is guilty of ITSP and conspiracy to commit ITSP.

## Search Warrants

l.      Search warrant for the residence at 2166 Wood Hollow Court, San Jose, California, more particularly described in Attachment A-1. The facts set forth in this affidavit establish that there is probable cause to believe that evidence, fruits, and/or instrumentalities of the offenses described in sub-paragraphs (a) and (b) above, and which items are more particularly described in Attachment B, will be found at this location.

m.      Search warrant for the residence at 167 Knightshaven Way, San Jose, California, more particularly described in Attachment A-2. The facts set forth in this affidavit establish that there is probable cause to believe that evidence, fruits, and/or instrumentalities of the offenses described in sub-paragraph (d) above, which items are more particularly described in Attachment B, will be found at this location.

## Agent's Background

2.      I am a police officer for the City of San Jose Police Department ("SJPD"), and have been so employed for the past eight years. For the past three years, I have been assigned as a detective in the Narcotics/Covert Investigations unit of the SJPD. I am also currently a sworn Deputy United States

Marshal and member of an FBI task force targeting Organized Retail Crime. My daily occupation is the investigation if crimes involving narcotics, stolen property, identity theft, and other crimes which lend themselves to covert investigation.

3.      I attended the San Jose Police Department Academy as part of my basic training to become a police officer. I received over 40 hours of training on theft-related crimes, including the receiving and passing of stolen property. I learned about how most thefts occur, and the motivation behind most property crimes. I learned about theft rings, which steal mass quantities of merchandise and then re-sell those items to "fences." I learned that fences then distribute the property through a variety of vendors, including storefronts, flea markets, and Internet-based markets.

4.      After I graduated from the basic academy, I completed the San Jose Police Department's field training program, during which I received hands-on training from experienced officers in all aspects of police work, including crimes involving stolen property. I receive periodic refresher training on stolen property crimes, in the form of video tapes, written materials and lectures, from the SJPD. I have also spoken with experienced burglary investigators and learned from them how most retail thefts occur and how the stolen property is then re-sold to the general public. I have participated in the investigation of over two-hundred stolen property cases and I have previously qualified as an expert for stolen property-related offenses in the courts of Santa Clara County. In addition, throughout calendar 2007, I worked undercover, posing as a "booster" of construction materials. In that capacity I met, befriended, and "worked" with a large number of thieves, including some ORC thieves.

5.      Beginning in December 2005, I began additional study in the field of Organized Retail Crime ("ORC"). I have spoken with experienced loss-prevention investigators who work for local retail chains (*e.g.* Safeway, Wal-Mart, Target, Raleys/Nob Hill). The investigators with whom I have spoken have advised me that their primary responsibility is the identification and apprehension of organized retail theft crews (also referred to as "booster crews"). Many of these investigators have prior law enforcement experience and all are knowledgeable in the field of ORC.

## Background Regarding Organized Retail Crime

6.      I have learned from retail store investigators that ORC is a growing problem throughout the United States, and is currently responsible for the vast majority of all thefts that are occurring on a retail level. Safeway investigator Celia Kettle estimates that between January 2005 and April 2007, ORC has cost at least $30 million in losses to her company in northern California alone. I have learned that ORC affects a wide range of retail establishments including supermarkets, chain drug stores, independent pharmacies, mass merchandisers, and convenience stores. ORC is separate and distinct from petty shoplifting in that it involves professional theft rings that move quickly from community to community and across state lines to pilfer large amounts of merchandise that is then re-packaged and sold back into the marketplace. Petty shoplifting, by contrast, is limited to items stolen for personal use or consumption.

BARG AFFIDAVIT (LE)                    -3-

7.      ORC theft rings typically target household commodities and consumer items that can be easily sold through fencing operations, flea markets, swap meets, and shady storefront operations. A "fence" is someone who buys and re-sells stolen property. A fence can be a former thief who has found selling and re-selling stolen property to be safer and more profitable than actually stealing the property. Fences often conceal their illegal activities, and launder their illegally-obtained profits, by establishing a business or storefront (also referred to as a "front"). Sometimes this front is engaged in some legitimate business, but often the front conducts no business whatsoever and instead is used only to conceal the illegal fencing operation. In some instances, stolen merchandise from one chain, identified by particular markings applied by that chain, has found its way to the shelves of other stores, which suggests that the ORC fences are re-selling stolen merchandise to wholesale distributors.

8.      Items that are in high demand by ORC theft rings include over-the-counter ("OTC") drug products, such as analgesics and cough and cold medications, razor blades, camera film, batteries, DVDs, beauty products, and infant formula. Those items are stolen in bulk. The fences generally pay the thieves no more than 25% of the actual retail value for the stolen items.

### Applicable Law

9.      The following criminal statutes, among others, are applicable to the conduct described in this affidavit:

a.      **Interstate Transportation of Stolen Property.** 18 U.S.C. § 2314 prohibits knowingly transporting, transmitting, or transferring in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud. Section 2314 is a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1).

b.      **Money Laundering.** 18 U.S.C. § 1956(a)(1) prohibits the following:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or . . .

(B) knowing that the transaction is designed in whole or in part –

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law.

c.     **Engaging in Monetary Transactions Using Criminally Derived Proceeds.** 18 U.S.C. § 1957 prohibits knowingly engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000, when such property is derived from a specified unlawful activity.

d.     **Conspiracy to Launder Money.** 18 U.S.C. § 1956(h) prohibits conspiring to commit any offense defined in either section 1956 or 1957.

e.     **Structuring Financial Transactions.** 31 U.S.C. § 5324(a)(3) prohibits structuring or assisting in structuring, or attempting to structure or assist in structuring, any transaction with one or more domestic financial institutions.

Structuring is defined in section 5324(a) as conduct designed to evade the reporting requirements under section 5313(a) or 5325 or any regulation prescribed under any such section, the reporting or recordkeeping requirements imposed by any order issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508.

## Facts Establishing a Conspiracy to Commit ITSP

10.     I am currently investigating an ORC case involving, among other co-conspirators, the subjects listed in paragraph 1 of this affidavit. Truc Quoc LE (LE) is the leader of this group. LE is an Asian male adult approximately 5 feet 7 inches tall, weighing approximately 190 pounds, with black hair, brown eyes, and a birth date of July 27, 1968. LE has a California driver's license number of B4211193, and a Social Security number ending in 3262. LE lives at 2166 Wood Hollow Court in San Jose. That address is listed on LE's driver's license and on the Department of Motor Vehicles registration for the vehicles registered to him. I have personally seen LE enter and leave this residence at all hours of the day and night.

11.     **ORC Thieves Arrested at Safeway Store.** On December 8, 2005, Celia Kettle, Senior Investigator with Safeway's Loss Prevention Department, observed three individuals commit a theft from two Safeway stores in San Jose. She immediately notified police, who responded to the scene and arrested the three suspects. Based on the amount and types of property stolen and the systematic manner in which the property was taken, Investigator Kettle characterized the thefts as organized and for the purposes of resale rather than personal use. Investigator Kettle told me that in each incident the three suspects entered the store together and, in concert with one another, stole merchandise that included medications, beauty aids, and grooming products.

12.     **ORC Booster Identifies "Chino" (Truc LE) as his "Fence."** After the arrest, one of the suspects, Hector Martinez, confessed to the crime and told San Jose Police Detective Guerrero that

he and his co-defendants had been stealing merchandise from different retail stores for about a year. Martinez said that he sold the property to an Asian male he knew only as "Chino" and whom Martinez described as an Asian male who drove a white Toyota Tundra pickup truck. Martinez said that "Chino" bought stolen Health and Beauty merchandise from fifty to one hundred different professional thieves, and that he believed "Chino" re-sold those items at local flea markets. A telephone number in Martinez's cell phone, (408) 394-6753, was labeled "Chino;" Martinez confirmed that this was the number of the "Chino" who bought stolen merchandise from him. Martinez also told Detective Guerrero that the stolen merchandise was usually transported in plain green or black plastic garbage bags.

13.    Martinez told Guerrero that "Chino" frequently picked up stolen property from "Tato," who Martinez said lived at 1911 Tampa Way in San Jose. Martinez stated that Tato was well-known among Honduran thieves as a person who facilitated the sale of stolen property, and that "Chino" had been buying stolen merchandise from "Tato" for years.

14.    I provided this information to Safeway Investigator Kettle, who told me that she had seen the white Toyota Tundra at local flea markets selling the same type of Health and Beauty Merchandise that was regularly being stolen from retail stores. Investigator Kettle gave me the license plate number of the truck: 7U10080. I confirmed that this 2005 Toyota Tundra truck was registered to Truc Quoc Le, 2166 Wood Hollow Court, in San Jose. I identified LE via a Department of Motor Vehicles database search and I began conducting surveillance at his residence.

15    **Surveillance of TRUC LE.** On January 6, 2006 I organized a surveillance operation at LE's residence, 2166 Wood Hollow Court. The surveillance began at 1620 hours when I saw the above-described Toyota Tundra arrive at the address. LE, whom I recognized from a DMV photo, was driving. At about 1830 hours, after watching LE walk in and out of the residence, San Jose Police Sgt. Moody saw a dark-colored Mercedes SUV arrive at the residence. The Mercedes had a license plate number of 4PIE502 and was being driven by an Asian male, whom I later identified as Lan Le (for ease of reference, "Lan").

16.    After he arrived, Lan immediately began assisting LE load the back of a yellow box truck (#5N44415) with cardboard boxes. The boxes appeared to be heavy. After the two loaded the truck (which is also registered to LE at 2166 Wood Hollow Court) with approximately 8 or 9 boxes, LE handed Lan two white garbage bags full of unknown items. Lan placed the bags in the back of the Mercedes. At approximately 1908 hours, the two men drove away together in the Mercedes.

17.    I followed the Mercedes and watched both subjects arrive at a restaurant/bar and walk inside to eat. After the two left the restaurant, SJPD Officer Solomon made a pretextual vehicle stop on the Mercedes. Officer Solomon the two subjects and obtained consent to search the vehicle. Officer Solomon opened the two white garbage bags and found that they contained sealed packages of toothbrush heads (Oral B, Sonic-Care, *etc.*). The officer noted that some of the packages had stamps on them indicating that they were once the inventory of a specific retail store. At my direction, Officer Solomon surreptitiously removed one of the packages and later turned it over to me.

18.    Officer Solomon asked the two where they had gotten the toothbrush heads. Neither answered that question, but Lan volunteered that they "sell them at the flea market." LE added that they "sell them for like $17." Officer Solomon said that she believed that those items cost around $30. Lan and LE responded that they sell them cheap at the flea market. Officer Solomon asked them for their phone numbers. LE provided a cell phone number of (408) 394-6753. Officer Solomon did not issue a citation. Later, she gave me the toothbrush head package. It had a stamp identifying it as having come from Safeway Store # 948, in Burlingame. I contacted Investigator Kettle, who told me that many Safeway stores stamp frequently-stolen items so that they can be identified later. She confirmed that Safeway Store # 948 had been the victim of ORC many times.

19.    **Second ORC Theft Crew Identifies "Chino" as Fence for Stolen Merchandise.** On January 4, 2006, Investigator Kettle identified another organized theft crew operating in San Jose. She identified 1746 Vollmer Way, in San Jose, as a possible associated residence. I coordinated multiple surveillances at that address and ultimately arrested three suspects on February 3, 2006, for twelve counts of theft and burglary. Based on my investigation, I attributed to this crew an estimated retail loss of over $100,000. I personally observed these three suspects steal thousands of dollars worth of merchandise from several stores and walk out with the stolen items concealed on their persons. After the three were arrested, San Jose Police Detective Paz interviewed one of the suspects. That subject, identified by the initials J.M., admitted selling stolen merchandise to a fence who went by the name "Chino." J.M. added that he believed "Chino" also goes by the name "Le." All three subjects had LE's telephone number, (408) 394-6753, saved in their cell phones, and also possessed inventory sheets listing particular items and the amount a fence would pay for those items.

20.    **Undercover Flea Market Purchases.** On January 15, 2006, SJPD Detective Paz visited the San Jose Flea Market in order to find out what items LE was selling and for what price. Detective Paz found Le selling health and beauty items next to the same yellow box truck described earlier (license plate #5N44415). Detective Paz approached Le directly and bought two 15-count Gillette Sensor Excel cartridges and 1 Gillette razor for $19 total (well below retail).

21.    On April 5, 2008, SJPD Officer Gerbrandt and I saw LE leave the residence at 2166 Wood Hollow. He was driving a white Dodge Sprinter van, license plate #8M44351. The van is registered to GLENN LENGSAVATH, born January 13, 1969, at 2166 Wood Hollow Court. LE drove to the San Jose flea market and set up his stand at space #A121. He put out several banana boxes and displayed various health and beauty items for sale, including Aleve, Tylenol, Oil of Olay, and Oral-B Toothbrush heads. We watched him for over an hour and saw him complete one sale.

22.    **Identification of TIEN LE and Stolen Property Suppliers from Los Angeles.** On January 17, 2006, I saw a green Toyota Camry (license #3UMY864) arrive at 2166 Wood Hollow Court. The Camry was registered to TIEN Q. LE, born July 9, 1963, whom I recognized from a DMV photograph as the driver. TIEN LE is an Asian male, approximately 5 feet five inches tall, weighing approximately 160 pounds, with a California Driver's License of # D7469285. I saw TRUC LE come out of 2166 Wood Hollow and meet with TIEN LE in the driveway. They spoke as if they were well acquainted. TIEN LE then drove away in the yellow Toyota box truck mentioned previously,

while TRUC LE entered and drove away in a white Toyota Tundra (#7U10080).

23.     I followed the two vehicles to the Berryessa Flea Market in San Jose. LE and TIEN LE parked near a U-Haul moving truck and met with the occupants: two Hispanic males and one Hispanic female. I watched as LE, TIEN LE, and one of the Hispanic males moved 30-40 cardboard boxes from the U-Haul into the yellow van. It took them approximately fifteen minutes. Each plain brown box measured approximately 18 by 18 by 30 inches. The boxes had no obvious markings. Afterward, LE and the Hispanic female spoke privately inside the Toyota Tundra. LE appeared to hand her something; when she got out of the truck, the woman clutched her purse to her chest, as if it now contained something valuable. All parties then separated. LE drove away in the Tundra, TIEN LE left in the van, and the three Hispanics departed in the U-Haul.

24.     I followed the U-Haul as it made its way to southbound Highway 101 toward Gilroy. At approximately 1200 hours, at my direction, SJPD Officer McCarthy stopped the U-Haul for vehicle code violations. Officer McCarthy obtained consent to search the truck and the female passenger's purse, as well as to take fingerprints from the three occupants. The truck was empty. The purse contained $77,000 in cash, packaged into eight bundles. The subjects were released after the driver was issued a citation; the driver was unlicensed, so the truck was towed. The money was not seized.

25.     A review of the U-Haul rental contract showed that the truck was rented to Heber Escamilla, who gave U-Haul a contact number of (323) 301-8718. LE's telephone records reveal that on January 30, 2006, Escamilla's telephone called LE's telephone; the call lasted 98 minutes. The next day, the two spoke again for approximately 82 minutes. They spoke again on February 1 and February 5, each call lasting two minutes.

26.     **Surveillance Shows TRUC LE Receiving Suspected Stolen Merchandise.** On January 20, 2006, I conducted surveillance at 2166 Wood Hollow Court. LE left at approximately 0940 hours and I followed him as he met with several unknown persons. He met some of them in front of residences in San Jose and met others in parking lots. Twice I saw LE receive large, full garbage bags and put them into the back of his truck. LE appeared to hand over money in exchange for the bags. After the second transaction, I noted that LE appeared nervous. He looked around frequently and I suspected that he may have thought he was being watched or followed.

27.     I followed LE back to 2166 Wood Hollow and watched as he met with two Asian males who arrived shortly after he did. I recognized one of them as Lan Le, whom I had seen helping LE on January 6, 2006. The other male was driving a gold Toyota Camry, license plate # 3UDZ886, registered to LEO NGUYEN, 3812 Rouen Court, San Jose. I later obtained the DMV photograph and confirmed that the person driving the gold Camry was LEO NGUYEN, born May 16, 1973.

28.     The three spoke briefly in front of the residence and then left in separate vehicles. I attempted to follow all three vehicles, but quickly lost track of Lan Le. However, I observed LEO NGUYEN follow LE to the area of King and Berryessa roads, in San Jose. I watched as they appeared to speak with one another by cell phone. At one point LE parked in a parking lot and sat in his truck talking

on the phone while LEO NGUYEN drove to surrounding parking lots and appeared to examine the vehicles and people in those lots, including me. Based on my training and experience, I believed that LEO NGUYEN was conducting counter-surveillance. In order to avoid being compromised, I terminated my surveillance.

29.     **LE Buys "Stolen" Goods from Undercover Police Officer.** On October 19, 2006, LE purchased purportedly stolen merchandise from an undercover police officer, Officer Mendoza. Officer Mendoza called LE on his cell phone and introduced himself as a street level thief who had over-the-counter medications and hygiene products to sell. LE told Officer Mendoza to meet him at the parking lot of a CHUCK E CHEESE restaurant located at 2445 Fontaine Road, San Jose. Officer Mendoza arrived with a large garbage bag of merchandise including DVD's, electric shavers, cordless phones, and over-the counter health and beauty products. Officer Mendoza met LE and sat in his truck while LE examined the goods. LE immediately noticed that most of the over-the-counter health and beauty products were scheduled to expire within a year (according to the stamps on the packaging). LE explained that products of this type were of no use to him and that he needed items that would not expire for at least a year after the date of the transaction. LE went into great detail explaining the "short date" problem to Mendoza, while Mendoza repeatedly apologized for his mistake. LE went as far as to write the date "11/07" on a piece of scratch paper for Mendoza so that they would not have the same problem again. LE also explained that he would not buy boxes that were damaged or torn. He instructed Officer Mendoza to leave the store stickers and stamps on the boxes so LE could remove them himself. LE reluctantly paid $70.00 to Officer Mendoza for two DVD's, one electric razor and two cordless phones, but refused to buy the OTC medications or hygiene products. The approximate retail value of the items LE purchased was $231.95.

30.     On October 24, 2006, Officer Mendoza called LE again and arranged to meet him at the same location. Officer Mendoza again brought a large garbage bag of merchandise that this time contained only OTC health and beauty (HB) items. The retail value of the merchandise was approximately $2,727.19; this time all the items had an extended expiration date. LE accepted the entire bag and paid Officer Mendoza $770 in cash for the load. Officer Mendoza inquired about exactly what items LE was willing to buy and what items he was not. LE wrote down a long list on a piece of paper. LE included not only brand names, but also the prices he was willing to pay for each item. LE gave the list to Officer Mendoza to keep as a reference.

31.     **LE Purchases Items from Additional Suppliers.** On January 19, 2006, I coordinated another surveillance directed at identifying LE's suppliers. At approximately 0900 hours I saw LE leave 2166 Wood Hollow Court and drive to a Bank of America at 2225 Quimby Rd, in San Jose. He walked into the bank and made a large cash withdrawal (estimated at over ten thousand dollars). LE left the bank and met with unknown persons at several different locations in San Jose. At one of those locations, 836 S. Jackson Ave., LE received two full dark-colored garbage bags (bulging with unknown contents) from an unknown subject and put the bags in his vehicle.

32.     LE returned to his residence and unloaded the bags into the courtyard behind his driveway. He left again at approximately 1140 hours and drove to the flea market on Berryessa Road. There

he met with two unknown male subjects who were driving a green Plymouth mini-van (#3STB842), registered to JOHANNA RODRIGUEZ, 11313 Oxnard St. #101, North Hollywood, California. LE and the two subjects made an exchange that I was unable to see. That meeting lasted approximately ten minutes, after which the van registered to Ms. RODRIGUEZ drove away southbound on Highway 101.

33.    LE returned to the flea market approximately an hour later and met with the two occupants, one Hispanic male and one Hispanic female, of another green mini-van, a Dodge (#5FBX436). This van was also registered to JOHANNA RODRIGUEZ. This time I was able to observe the meeting and saw LE receive two full garbage bags from the female. LE appeared to hand her some sort of payment. The meeting lasted less than ten minutes. Afterward,  the van drove southbound on Highway 101. Although I was not able to see her well enough to identify her, the female who gave the garbage bags to LE appeared similar to the description on file for the "JOHANNA RODRIGUEZ" to whom both minivans were registered: five feet three inches tall, approximately 130 pounds, brown hair and brown eyes (although I could not see her eyes). According to DMV records, JOHANNA RODRIGUEZ was born March 10, 1980. She has a prior conviction for burglary out of Costa Mesa, California; she was convicted of stealing a large quantity of diabetic test strips using a "booster bag" designed to defeat the store security system.  After her arrest, Ms. RODRIGUEZ gave a statement in which she admitted to being a part of a large professional theft ring that steals from retail stores.

34.    **LENGSAVATH and THANH LE Drive to Southern California to Pick Up ORC Items.** On April 18, 2008, I conducted another surveillance at 2166 Wood Hollow and saw the white Dodge Sprinter van leave the residence at approximately 0600 hours.  I followed the van with two other officers. We followed it south on Highway 101 and eventually to southbound Highway 5. I arranged for a California Highway Patrol (CHP) officer to stop the van south of Highway 152. CHP Officer Arpaia stopped the van and identified the driver as GLENN LENGSAVATH and the passenger as THANH Q. LE, born June 26, 1975. Officer Arpaia asked the driver what they were transporting. LENGSAVATH responded that they were driving to Los Angeles to pick up groceries for a store they own in San Jose. Officer Arpaia let them go with a warning.

35.    Following the ruse stop, my partners and I followed the van to Los Angeles, to an Enterprise Self Storage facility located at 10711 Vinedale Avenue in Sun Valley. LENGSAVATH and THANH LE met with the occupant of a green minivan (#6CGA267).  This minivan is also registered to JOHANNA RODRIGUEZ. LENGSAVATH and THANH LE drove into the gated parking lot and proceeded to storage unit # 49.  Officers Gerbrandt and Mank entered the facility on foot and saw LENGSAVATH, THANH LE, and JOHANNA RODRIGUEZ spend approximately 40 minutes loading large plain-brown cardboard boxes from the storage unit into the Dodge Sprinter van. Officers Gerbrandt and Mank later looked at a DMV photograph of JOHANNA RODRIGUEZ and identified her as the person who was with LENGSAVATH and THANH LE at the storage facility.

36.    After leaving the storage place, LENGSAVATH and THANH LE drove back to San Jose. As they were driving north on Highway 5, I again arranged for a ruse traffic stop. CHP Officer

Briceland made the stop north of Highway 33. He identified the driver as THANH LE and the passenger as GLENN LENGSAVATH. When Officer Briceland directed questions to the driver, THANH LE demurred, stating that he was only the driver and that he worked for LENGSAVATH. When the officer asked what they were transporting, LENGSAVATH responded, "children's toys." Officer Briceland obtained from LENGSAVATH (the registered owner) written consent to search the van. As the officer approached the rear cargo doors to begin the search, LENGSAVATH amended his earlier statement and said that they were actually transporting "cosmetics." Officer Briceland found approximately 36 boxes and six full plastic garbage bags in the back of the van. He inspected a sample of the contents and found an assortment of items, including Sonicare toothbrushes, Prilosec, Claritin, Crest Whitestrips, Advil, and miscellaneous razor blades.

37.    Officer Briceland asked about the contents of the boxes and bags. LENGSAVATH replied that they had just purchased the load from an unknown location in "downtown Los Angeles." He also boasted that the load was worth "ninety thousand dollars." Officer Briceland asked what they were going to do with the merchandise and Lengsavath replied that they were going to sell it at the flea market. Officer Briceland asked for proof of ownership. LENGSAVATH produced a handwritten list on a plain white piece of paper. Officer Briceland examined the list and observed that it was not an official invoice and also that it did not appear to contain a comprehensive inventory of what was in the van. Officer Briceland issued THANH LE a warning for the vehicle code violation and sent them on their way.

38.    **Arrest of Booster "Tato."** On April 8, 2008, Officer Gerbrandt and I conducted a surveillance operation, the target of which was a Honduran theft ring operating out of 2779 Woodmoor Avenue, in San Jose. We followed the thieves away from this residence and we watched as they burglarized the Ross clothing store located at 11 Curtner Avenue, in San Jose. During the burglary the ring acted professionally, employing counter-surveillance and cell phone communications to avoid apprehension. They also discreetly used wire cutters to remove sensor tags from the items they were stealing.

39.    After the burglary, Officer Gerbrandt and I arrested the three subjects and learned that one of them went by the nickname, "Tato." Tato identified himself to us as Eduardo Zuniga and told us that he used to live at 1911 Tampa Way, in San Jose.[1] Tato has a prior conviction for organized retail theft of OTC/HB items and explained to me that he used to deal directly with an Asian male whom he referred to as "Chino." He told me that Chino used to drive a white Toyota Tundra truck and work at the San Jose flea market. Tato told me that Chino had knowingly purchased stolen OTC/HB products from him and his cohorts for several years.

40.    Officer GERBRANDT and I re-interviewed Tato in custody on May 6 and May 7, 2008. During these interviews he gave more detail about his interactions with "Chino" and positively identified "Chino" as TRUC LE after being shown a photo lineup. Tato also identified an associate of TRUC LE, whom Tato could only describe as an Asian male who looked like TRUC LE's older

---

[1] See ¶ 13, *supra*.

**BARG AFFIDAVIT (LE)**                    -11-

brother. When we showed Tato a second photo lineup, he quickly identified TIEN LE as this person. Tato told us that TIEN LE occasionally rode with TRUC LE to pick up stolen merchandise and on several occasions TRUC LE sent TIEN LE to pick up property on his own.

41.    **LENGSAVATH and TIFFANY VU Check Retail Prices on OTC/HB Products.** On April 22, 2008, IRS Criminal Investigations Special Agent Quyen Madrigal and her team observed LENGSAVATH and his wife, TIFFANY VU, conducted what appeared to be a price-comparison trip to a Target store in San Jose. LENGSAVATH and VU drove to the Target store at 2161 Monterey Highway and spent nearly two hours browsing the OTC/HB department. They appeared to be price-shopping because after examining the items for sale in the store, they left without buying anything. It is noteworthy that the two spent a significant amount of time in the health-and-beauty and pharmacy sections of the store testing out products and reading price and product labels. These products are the kinds of items that, based on the facts described in this affidavit, I believe LENGSAVATH and his co-conspirators buy from boosters and re-sell locally or to wholesalers out-of-state.

42.    **THANH LE Pays Suspected Boosters $107,000 in Los Angeles.**  On May 20, 2008, I learned that the Dodge Sprinter van, license plate number 8M44351, had left 2166 Wood Hollow at approximately 0530 hours and appeared to be driving toward Southern California. Case agents notified counterparts in Los Angeles to tell them the van was on its way. Los Angeles County Sheriff's deputies picked up the surveillance when the van arrived in Burbank at approximately 1145 hours and followed it to A-1 Self Storage, 4427 San Fernando Road, in Glendale. The van drove to space number 38, rented in the name of Carmen Gutierrez. Deputies watched as the van's occupants, THANH LE, who was driving (identified by a DMV photo), and an unidentified Asian male passenger, met with four Hispanics – two males and two females – who were in a blue 2004 Honda Accord, license plate number 6BEF058. After the meeting, as the Honda left the facility, the deputies stopped it for a vehicle code violation (a ruse stop).  After the stop, the two females ran away; the deputies stayed with the two males and did not immediately give chase.

43.    After a short search for the two female suspects, deputies saw one of them get into a taxi cab a few blocks from the original vehicle stop location. The female possessed a large oversized purse that contained numerous bundles of one hundred dollar bills, totaling $107,901 in US currency. The two males and one female were arrested and booked into Los Angeles County Jail for various misdemeanor crimes. The second female escaped.[2] All three defendants have prior convictions for

---

[2]It should be noted that the three suspects arrested by on May 20, 2008 were the same three individuals who were stopped and identified following a prior dealing with TRUC LE on January 17, 2006. See ¶¶ 22-24, *supra*. On that date, agents observed TRUC LE meet with Freddy Navarro, Carmen Garcia and Juan Morales in the Berryessa Flea Market parking lot. Property was moved from the U-Haul truck the three Hispanic suspects were driving to TRUC LE's box truck.  A subsequent ruse enforcement stop by a uniformed San Jose Police officer identified the three individuals and found that Carmen Gutierrez possessed $77,000 in cash in her purse – all in $100 bills.  The three were cited and released for a Vehicle Code violation.

theft. The next day, Los Angeles County Sheriff's deputies served a search warrant at the A-1 storage facility, space number 38, and found approximately $3,000 worth of OTC/HB products (mostly Claritin) as well as approximately ten empty boxes (one of which had "Oil of Olay" written on it), and inventory sheets listing similar OTC/HB products.

44.     At approximately 1730 the same day, agents observed the Dodge Sprinter, driven by THANH LE and accompanied by an unidentified Asian male, drive into the San Jose area. THANH LE drove the van to 3541 Edgeman Court in San Jose and parked in the driveway. A few minutes after they had arrived, TRUC LE arrived in a silver Toyota Corolla, license plate 4UUK877, registered to TRANH LE. Approximately 30 minutes later, the three men left in the Corolla. Case agents checked the van and the exterior of the house and saw that the van had been washed, indicated by water on and around the van. The Edgeman court residence is owned by TRUC LE.

### Facts Establishing Shipments of Stolen Goods in Interstate Commerce (Interstate Nexus)

45.     **Suspected Stolen Merchandise Delivered to Lynden Air Freight for Shipment to Utah.** In August 2006 I conducted surveillance at 2166 Wood Hollow Court. I watched LE exit the residence and enter his yellow Toyota panel van. I followed him as he drove to the rear of 3812 Rouen Court in San Jose (LEO NGUYEN's residence). I watched as LE drove the truck into the driveway and began moving boxes from his truck into a delivery truck labeled "Anytime Services." It took over an hour to move all of the boxes (I counted more than fifty). The boxes were placed on pallets and loaded onto the delivery truck. Each box was plain brown cardboard and was approximately 18 by 18 by 30 inches. I then followed the delivery truck to find out where the boxes were being shipped. The truck made several stops, but eventually arrived at Lynden Air Freight, located at 50 Edwards, Burlingame, California 94010.

46.     I served Lynden Air Freight with a subpoena for shipping records and discovered that during the period between 02/03/06 to 11/17/06, Lynden Air Freight moved thirty shipments from LEO NGUYEN at 3812 Rouen Court, San Jose, to a company called Medsource, located at 2391 South 1560 West Street, Woods Cross, Utah. Each shipment ranged in size from three to seven pallets, for a total of approximately 128 pallets shipped. Each pallet contains approximately 30 boxes, yielding a total of approximately 3,840 boxes shipped during that nine-month period.

47.     I went to the Internet web page for Medsource (www.medsource-direct.com) and discovered that the company supplies health and beauty merchandise to retail stores. I noted that Medsource supplies the same items that are being stolen by the organized theft rings and then fenced to LE. The Medsource web page lists the following individuals as members of its Management:

        Tim Farnes, Owner and President
        Tyler Farnes, Rx
        Gary Farnes, Procurement

---

Carmen Gutierrez was allowed to keep the money in her possession

Neal Graff, HBC/OTC[3]
Bonnie Bell, Medsurg
Steve Call, Diabetic Sales
Justin Leavitt, CFO

48.    On February 23, 2007, Officer Gerbrandt received a phone call from Lynden Air Freight employee Roy Pasao, who advised Officer Gerbrandt that on February 7, 2007, a male identifying himself only as "GLENN" had called and said that he had been referred by LEO NGUYEN. GLENN stated that he would be a new shipper for Medsource, and that he wished to send a package. Mr. Pasao told GLENN that this would be fine, but that he would be responsible for the shipping costs. GLENN responded that he expected Medsource to pay for the shipping, and then hung up.

49.    On March 14, 2007, a Lynden employee advised me that LEO NGUYEN was about to send a shipment from 3812 Rouen Court to Medsource in Utah. The shipment would again be delivered from the Rouen Court address to the Lynden Facility in Burlingame. From there it would be trucked to Utah.

50.    I obtained a search warrant to search the shipment en route to its destination in Utah. The warrant was signed by Magistrate Judge Patricia V. Trumbull and served by me on March 15, 2007, in Burlingame. The shipment consisted of thirty-two boxes, divided into three pallets. Each box was labeled (in black ink) "Olay" with a number (ranging from 170 to 200). I searched and inventoried one box from each pallet, and confirmed that each box contained Oil of Olay products. I estimated a total wholesale value for the shipment of approximately $80,000 and a total retail value for the shipment of approximately $128,000. I seized one item of Oil of Olay because it had an electronic store tag attached to the underside of the container.

51.    **Interstate Shipments from Forward Air.** On April 11, 2008, I conducted another surveillance at 2166 Wood Hollow Court. I watched the Dodge Sprinter van (#8M44351) registered to GLENN LENGSAVATH leave the residence. LENGSAVATH was the driver and THANH LE was the passenger. I followed them to South San Francisco, where they ended up at Forward Air transportation services, located at 408 Littlefield Avenue. I watched them unload 94 plain-brown cardboard boxes from the van and place them on pallets in the parking lot of the business. They assembled a total of six pallets (five bearing 16 boxes and one with 14) and then placed shipping labels on each box. They then wrapped each pallet with stretch-plastic wrap and left them with Forward Air. A Forward Air employee brought each pallet inside the terminal, after which LENGSAVATH and THANH LE drove off. After they had left the area, but before all of the pallets had been placed inside the terminal, I walked up to one of the pallets and examined the shipping label. It indicated that the package was going to Miami, Florida and contained "over the counter supplies." The shipper was listed as "YRC Logistics," a company I recognized to be a division of Yellow Roadway (see ¶ 53, *infra*). I asked one of Forward Air's employees about the shipment. He told me that YRC Logistics was the freight forwarder, but that the pallets had been dropped off by

---

[3]See ¶¶ 55-56, *infra*.

"TG Distribution" (which I surmise, but do not know for sure, may stand for "Truc Glenn" Distribution).

52.     On April 21, 2008, IRS Criminal Investigations Special Agent Quyen Madrigal coordinated another surveillance of LE and his associates. S/A Madrigal and her team observed LENGSAVATH leave his residence at 167 Knightshaven Way and drive to 2166 Wood Hollow Court. There he picked up the white Dodge Sprinter van. LENGSAVATH drove the van with THANH LE to Forward Air. Once again, they stacked boxes onto pallets for shipping. After they had done so, LENGSAVATH drove THANH LE back to Wood Hollow Court and then drove alone to Washington Mutual Bank.

53.     **Interstate Shipments by TG Company Using Carrier Yellow Roadway.** On April 22, 2008, I served subpoenas on Yellow Transportation Company/ Roadway Express, USF Reddaway, and YRC/USF Logistics. All three companies are owned by Yellow Roadway Company and are believed to be shipping stolen merchandise across state lines for TG Distribution, as well as for Medsource. Signature cards for bank accounts at Washington Mutual under the name TG Distribution, Glenn LENGSAVATH, and TIFFANY VU all give the address 167 Knightshaven Way, San Jose, which is the residential address for LENGSAVATH and his wife (Vu). In addition, wire confirmation slips from the TG Distribution bank account at Washington Mutual bear the address 167 Knightshaven Way, San Jose. Shipping records obtained from Yellow Transportation established the following: between February 22 and April 25, 2008, TG Distribution shipped at least eight times with Roadway Express. The bills of lading showed that two of the shipments were sent to Prime International, Inc., in Weston, Florida, and that six shipments were sent to COOLRELIC in Tamarac, Florida. The shipments ranged in size from 22 boxes to 94 boxes and all of the bills of lading described the contents as "over the counter supplies." Four of the shipping bills listed the TG Distribution point of contact as "GLENN" and four listed his wife, TIFFANY VU.

54.     **Interstate Shipments Using R & L Carriers.** On May 8, 2008, I conducted another surveillance targeting GLENN LENGSAVATH and TRUC LE. I watched LENGSAVATH drive the white Dodge Sprinter van from San Jose to San Lorenzo, where he unloaded roughly thirty cardboard boxes onto pallets at a shipping company named R & L Carriers. I contacted the terminal manager of R & L and he told me that the shipper's name was TG DISTRIBUTION and that TG DISTRIBUTION regularly sends merchandise to a receiver in Utah named "GCE." He told me that they ship every other week or so. He added that the shipments are typically described only as "Medicines."

55.     On May 15, 2008, I served R & L with a subpoena for all shipping records pertaining to "GCE." Immediately after serving the subpoena I received a phone call from R & L investigations manager Greg Dehart, who told me he was sending me the records I had requested. He also told me that I should be aware that R & L's contact for "GCE" is NEAL GRAFF (see Medsource's executive management team, *supra*). Dehart told me that NEAL GRAFF personally picks up the shipments when they arrive at the R & L terminal in Utah. Dehart further advised that since GRAFF picks up

the shipments personally, he is required to provide R & L with a photo ID. Dehart provided me a copy of GRAFF's Utah drivers license along with the subpoenaed shipping records.

56.    The R & L shipping records show that TG DISTRIBUTION shipped to GCE (at 90 W. 500 St. #531, Bountiful, UT 84010) seven times between March 6 and May 13, 2008. Each shipment consisted of multiple boxes on multiple pallets and the consignee for each was NEAL GRAFF. The shipments were described as "vitamins, medicines, and cosmetics."[4] A shipment sent on April 17, 2008 listed 2166 Wood Hollow Court, San Jose, as the address for TG DISTRIBUTION. In addition, between February 11 and March 28, 2008, Neal Graff, 258 Park View Drive, Bountiful, Utah, sent sixteen wires totaling $391,056 to GLENN LENGSAVATH/TG DISTRIBUTION, 167 Knightshaven Way, San Jose.

## Facts Establishing Money Laundering By Certain Defendants

57.    I submit that there is probable cause to believe that TRUC LE, THUY DANG, LEO NGUYEN, GLENN LENGSAVATH, and TIFFANY VU are guilty of money laundering and/or of structuring financial transactions. The facts supporting that conclusion as to each defendant below are set forth in the following paragraphs. As an overview, these ten bank accounts are associated with the TRUC LE criminal organization. A number of these accounts are specifically discussed in the paragraphs that follow:

| Bank Name | Bank Account # | Name on Account |
|---|---|---|
| Washington Mutual | # 308-145368-6 | Doug Dang, Thuy Dang, Dinah Dang |
| Wells Fargo Bank | # 100-1296027 | Truc Le and Thuy Dang |
| Washington Mutual | # 315-425159-5 | Glenn Lengsavath, Tiffany Ha Vu, Thuy Dang |
| Washington Mutual | # 306-209770-0 | Glenn Lengsavath dba TG Distribution |
| | # 316-072522-9 | Glenn Lengsavath dba TG Distribution |
| Washington Mutual | # 315-121396-0 | Tiffany Ha Vu |
| Bank of America | # 18183-03528 | Tiffany Ha Vu |
| | # 18186-01410 | Tiffany Ha Vu |
| Bank of America | # 18809-01142 | Glenn Lengsavath |
| | # 23552-11384 | Glenn Lengsavath |

_____

[4] R & L shipping records also reveal that between January 19, 2006 and December 6, 2007, Medsource made at least 64 shipments to Albertson's supermarkets. Each shipment consisted of multiple pallets of cargo and most bills of lading described the contents as "Medical Supplies."

BARG AFFIDAVIT (LE)                    -16-

58.   **TRUC LE and THUY DANG (Husband and Wife).** On January 6, 2006 LE and his wife THUY DANG were observed going to a Washington Mutual branch where they were seen making cash withdrawals. Washington Mutual Bank (#196-473405-8) records reveal that LE made two cash withdrawals that day: one for $5,000 and the other for $50,000.[5]

59.   On January 17, 2006, LE made two separate $5,000 cash withdrawals from his Washington Mutual account # 196-473405-8.[6]

60.   Financial records from January 2006 to March 2007 show that THUY DANG received large and regular payments on behalf of LE. She received payments from JULES VO in the amount of $70,415, from TOWER DC[7] for $96,766, and from LEO NGUYEN totaling $1,566,961. THUY DANG cashed over $600,000 in checks she received from LEO NGUYEN. Based on the review of bank records performed by IRS S/A Madrigal, as well as my training and experience, I believe that THUY DANG is the payee on most of the checks because she has legitimate sources of income: she has a salaried job with Harris Corporation and also co-owns a nail salon, Tina and Lan Nails. THUY DANG also opened an account at Washington Mutual (#308-145368-6) with her brother Doug Dang and his wife Dinah Dang, who live in San Diego. This account is (or in the case of Leo Nguyen, was) used to receive payments from LEO NGUYEN and GLENN LENGSAVATH. A review of this account shows debits and withdrawals used to pay personal living expenses for THUY DANG and TRUC LE.

61.   **Wells Fargo Bank account # 100-1296027,** held in the name of Truc Le and Thuy Dang. Analysis of this account showed that during January 2006 through March 2007, approximately $30,000 was received from Leo Nguyen from wire transfer and check payments. In addition, $95,700 in cash was deposited into this account. All of the deposits were under the $10,000 amount to avoid CTR filing requirements. In addition the account showed $68,814 in cash withdrawals, all under the CTR filing requirement. This account also showed payments towards personal living expenses for Thuy Dang and LE. Current review of the account shows that this account is still being used as part of LE's fencing operation. Deposits are made into the account and cash withdrawals are conducted in the amount of $10,000 and below.

62.   In addition, THUY DANG is a signatory on another account opened by LENGSAVATH. **Washington Mutual account 315-425159-5** is held in the names of LENGSAVATH, his wife

---

[5]This is the same day that LE and Lan Le were seen loading boxes and bags of suspected stolen merchandise into the yellow box van. See ¶¶ 15-18, *supra*.

[6]This was the same day that LE and TIEN LE met the three Hispanics at the Berryessa flea market and apparently paid them $77,000 cash for stolen property. See ¶¶ 22-25, *supra*.

[7]Tower DC is an on-line distributor of suspected stolen OTC/HB products. On January 19, 2006, I observed LE meet with persons whom I could not identify. However, their vehicles were registered to two principals of Tower DC.

TIFFANY VU, and THUY DANG. This account was opened on January 24, 2007. Bank records from April through December 2007 show that 71 wires totaling $2,649,112 were received during that period from Farnes Enterprises, dba Medsource Direct. During that same period another 38 wires totaling $2,118,100 came in from Coolrelic International. In addition there were structured cash withdrawals totaling approximately $597,800 from this account, and each of those withdrawals, which were made on almost a daily basis, were in amounts equal to or less than $5,000. From this account, approximately $76,772 was wired to Washington Mutual account 308-145368-6 under the name THUY DANG, Doug Dang, and Dinah Dang from January through March of 2007. A current review of the account shows the same pattern of activity.

63.    In addition, LE and THUY DANG's 2006 joint tax return shows reports gross receipts from their businesses of $ 27,886 (LE's flea market business) and $ 96,185 (DANG's nail salon). However, LEO NGUYEN's account shows checks and wires to THUY DANG totaling $1,566,961 that were not reported on LE and DANG's 2006 joint tax return.

64.    **LEO NGUYEN.** As an overview, it should be noted that LEO NGUYEN's involvement in the criminal conspiracy appears to have ended in approximately March or April of 2007, at which time his role seems to have been taken over by LENGSAVATH. However, NGUYEN's bank accounts for the period during which he was active reveal that he was integrally involved in the conspiracy from no later than October 2005 through March or April 2007, and that he engaged in the following money laundering activity:

65.    LEO NGUYEN used four bank accounts during the time he was involved with LE's criminal activities: Bank of America accounts 06796-41509 and 11863-44426, Wells Fargo Bank account #561-2226935, and Washington Mutual account 097-298192-4. From October 2005 through March 2007, NGUYEN received deposits from Farnes Enterprises dba Medsource Direct, totaling $6,074,485, and from various other customers totaling $6,637,047. NGUYEN made $1,675,901 in cash withdrawals from his bank accounts during this period. Most of those withdrawals were for less than $10,000. Debits to NGUYEN's accounts during this period include $48,351 in checks to Doug Dang, $50,000 wired to LENGSAVATH, $50,000 wired to Washington Mutual account 315-425159-5 (Lengsavath, Thuy Dang, TIFFANY VU), $683,092 distributed to Lam Le Nguyen (associate of LE) by wires and checks, and $1,566,961 to THUY DANG through checks and wires. Approximately $120,000 in checks also went to TIFFANY VU. Another $285,000 in checks were written to Trinh Lam,[8] while $71,040 in checks were written to TRUC LE (who cashed them).

66.    Beginning in approximately April or May 2007, NGUYEN stopped receiving wires; LENGSAVATH and TIFFANY VU appear to have taken over Nguyen's responsibilities as the point

---

[8]Based on account activity, it appears that Trinh Lam is someone through whom the TRUC LE organization launders payments. Trinh Lam receives checks, cashes them, then presumably turns that money over to someone in the LE organization.

of contact for LE's customers.[9] In addition, Lynden Air Freight, the shipping company Nguyen used to ship products to Medsource, received a phone call from "Glenn" on February 7, 2007, saying that he would be taking over Nguyen's role in shipping products to Medsource.

67.    Bank records further reveal that LEO NGUYEN received wire payments from the wholesaler in Utah, Medsource Direct, from the beginning of 2006. LEO NGUYEN then structured the money out of his bank account by making multiple $9,800 cash withdrawals on the same day, or he wire-transferred the funds to others: Nha Nguyen, Trinh Lam, Lam Le Nguyen, THUY DANG, Doug Dang, TIFFANY VU, and LENGSAVATH, who in turn made $9,900 or $9,800 cash withdrawals on the same day or on the next day. Based on my investigation, I believe the cash was then turned over to TRUC LE to be used to purchase more products from boosters.

68.    **GLENN LENGSAVATH and TIFFANY VU.** Information regarding money laundering activity committed by LENGSAVATH is also detailed above in the paragraphs dealing with TRUC LE and THUY DANG. In addition, LENGSAVATH and his wife, TIFFANY VU, are the owners of Washington Mutual account 306-209770-0. That account, held in the name of Glenn G. Lengsavath, dba TG Distribution, and TIFFANY HA VU, was opened in June 2007. From August 21, 2007 through January 4, 2008, this account received 47 wires totaling $ 2,947,530 from Coolrelic International. This account also shows cash withdrawals totaling approximately $508,000 from August 2007 through December 2007. With the exception of one, all of those cash withdrawals were in amounts less than $5,000, made on either the same day or on consecutive days, and from different branches.

69.    LENGSAVATH has two Bank of America accounts in his own name:18809-01142 and 23552-11384. From September 2006 to November 2007, those two accounts received 100 deposits totaling $277,939: $ 14,790 in cash and nine wire transfers totaling $158,505. In addition, during that period there were 24 cash withdrawals made on the same day or the day after deposits were received. Those cash withdrawals were in amounts less than $10,000 and therefore appear to have been structured transactions designed to avoid CTR filing requirements. This account received four wires from LENGSAVATH's Washington Mutual account, one wire from TIFFANY VU, one wire from LEO NGUYEN for $40,000, and two wires from the Washington Mutual account 315-425159-5 jointly-held with THUY DANG, totaling $35,000. Debits from the account include personal expenditures such as mortgage payments for the residence at 167 Knightshaven Way, San Jose, groceries, and credit card payments. This account appears to be used in the layering of funds to assist in LE's ITSP and money laundering activities.

70.    LENGSAVATH has another Washington Mutual account, 316-072522-9. In February and

---

[9]Current review and comparison of GLENN LENGSAVATH's bank accounts to LEO NGUYEN's bank accounts show a similar pattern of activity. LENGSAVATH is receiving wires from Medsource and Coolrelic and is distributing those payments to the same persons to whom LEO NGUYEN used to distribute funds, and is also conducting multiple and frequent cash withdrawals in amounts designed to avoid triggering CTR reporting requirements.

BARG AFFIDAVIT (LE)                    -19-

March 2008, he received sixteen wire deposits, totaling $478,075, into this account from Neal Graff (see ¶¶ 55-56). In addition, there were 33 cash withdrawals during that period, totaling $375,000. The majority of those withdrawals were for $5,000, made on either the same day or consecutive days. This kind of withdrawal activity would appear to be designed to avoid the filing of a CTR by the bank. During that period, LENGSAVATH made $193,000 in wire transfer deposits from his Washington Mutual bank account 306-209770-0, held in the name of Glenn Lengsavath, dba TG Distribution. Few, if any, expenses or bills paid from the 316-072522-9 account. Instead, this account is used almost exclusively as a means of layering income.

71.    TIFFANY VU also has three accounts in her own name that have been used to launder money and structure cash transactions. TIFFANY VU owns two Bank of America accounts in her own name: #18183-03528 and 18186-01410. A review of those accounts by S/A Madrigal shows that from February 1, 2007 through March 24, 2008, 114 deposits were received, totaling $451,241. Of those deposits, $290,000 were wire transfers from LENGSAVATH and/ or TIFFANY HA VU. A total of $246,600 in cash withdrawals were made from these two accounts, each of them under the $10,000 reporting requirement. Other debits to the account were for personal expenditures such as Capital One, Citicard, and Chase Auto Finance. It appears that those Bank of America accounts are being used to promote the illegal fencing activity that is at the heart of this affidavit.

72.    TIFFANY VU also owns Washington Mutual account # 315-121396-0. This account, established in October 2006, has received multiple wire-transfers from Coolrelic International, Medsource Direct, as well as several wire transfer deposits from Washington Mutual account 315-425159-5 (the account Ms. Vu and her husband hold jointly with THUY DANG). This account reflects cash withdrawals of $5,000 or less on almost a daily basis, activity which appears to be structured for the purposes of evading CTR filing requirements. From December 2006 through June 2007, for example, cash withdrawals totaled $533,500. This account appears to be used to promote illegal fencing activity described in this affidavit.

## Information Regarding Items to Be Seized

73.    I submit that there is probable cause to believe that evidence of the criminal offenses described in this affidavit will be found at each of the locations described in paragraph one of this affidavit. Those locations are more particularly described in Attachments A-1 and A-2. In the following paragraphs I will summarize the reasons why I believe that the evidence, fruits, and instrumentalities of crime, more particularly described in Attachment B, will be found at each of those locations.

74.    Based on my training and experience and through discussions with experts, I know that individuals engaged in fraudulent schemes using apparently legitimate business entities generally maintain some sort of business records (whether in paper or electronic form or both). Furthermore, I am aware that there are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may appear to be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal

calendars, telephone and address directories, checkbooks, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, telephone and pager bills, keys to safe deposit boxes and rental storage lockers and computer hardware and software), but may be both relevant and significant when considered in light of other evidence. Likewise, the evidence may be highly valuable to the offender or have high utility for legal applications, such as valuable personal property (e.g., art, jewelry, precious metals and stones, real estate, securities), large sums of U.S. currency, safes, firearms, communications equipment, and computer equipment. The criminal offender may no longer realize that he or she still possesses the evidence or that law enforcement could obtain a search warrant to seize the evidence.

75.     With respect to money laundering offenses, I have learned through my experience and through discussions with recognized law enforcement experts, including discussions with informants and former co-conspirators that:

    a.      Persons who commit illegal money laundering frequently operate several businesses at one time, frequently change the name of, or incorporate new businesses, in order to evade discovery. Such persons may also maintain numerous business bank accounts and create multiple layers of movement of their funds in an attempt to mask the disposition of the illegal proceeds;

    b.      Persons who commit money laundering activities frequently maintain records of such transactions similar to the recordkeeping of legitimate businesses. Such records are commonly retained for long periods of time, often years after the actual money laundering activities occurred. Those records often show evidence to identify co-conspirators; the location of bank accounts used to launder the illegal proceeds, including nominee names to maintain these accounts; and the identification of property, both real and personal, belonging to the money launderer or his co-conspirators that were purchased with illegally laundered funds;

    c.      Persons involved in the laundering of illegal proceeds often receive significant financial profits as a result of their laundering activities. Evidence tending to establish the receipt of significant, unexplained, and unreported income may include state and federal tax returns; bank statements, including deposit slips and canceled checks; savings passbooks; records of the purchase of cashier's checks and official bank checks; business and personal ledgers; and personal computer records. Such evidence will also assist the government in identifying property, both real and personal, that constitutes ill-gotten gains that may be subject to seizure. Money launderers often seek to conceal the illegal profits by diverting laundered funds into the purchase of real estate, investments in brokerage accounts, vehicles, investments in legitimate businesses, precious metals, jewelry, or other tangible assets;

    d.      Persons who launder illegal proceeds frequently keep large quantities of currency on hand. This is because it is an item essential to carrying on the activity of money laundering. In this case, it is all the more true because that currency is needed to keep the business going (by paying boosters for new product). This currency is usually found in the individual's residence, businesses, vehicles, and in safe deposit boxes at financial institutions linked to these persons.

76.     For these reasons, as well as additional reasons stated previously, I believe that it is probable that evidence, fruits, and instrumentalities, such as those items more particularly described in Attachment B, will be located at the locations proposed to be searched.

## Information Regarding Data Stored Electronically

77.     Based upon my knowledge, training, and experience, including information provided to me by others with specific expertise in this area, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to insure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

   a..    Computer storage devices (like hard disks, diskettes and CD-ROMs) can store the equivalent of thousands of pages of information. Additionally, a user may try to conceal criminal evidence by storing it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

   b.     E-mail is known to be a popular method of communication between associates or conspirators who reside in different locations. Evidence of e-mail communications may be found in Internet history, e-mail applications, etc., which can be found on computers.

   c.     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.

   d.     Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. Based on my training and experience I know that computer users sometimes encrypt files, and that such users may keep the encryption passwords or encryption keys separately written in their residences or on a separate computer file.

78.     Because of the volume of the data at issue and the technical requirements set forth above,

BARG AFFIDAVIT (LE)                    -22-

it may be necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting.

79.     Based upon my knowledge, training, and experience, and the experience of other law enforcement personnel, I know that searches and seizures of evidence from computers taken from the subject possession commonly require agents to seize most or all of a computer system's input/output peripheral devices for a qualified computer expert to accurately retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the subject possession, and in order to fully retrieve data from a computer system, investigators must seize all magnetic storage devices as well as the central processing units ("CPU") and applicable keyboards and monitors which are an integral part of the processing unit.

80.     The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation. Without these items, it may be difficult to recreate the computer environment in which the seized data was created. This is important both for thorough analysis and for establishing the ultimate integrity of the seized data.

81.     **Analysis of Electronic Data**. The analysis of electronically stored data, whether performed on site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but are not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

82.     **Computer Search Protocol**. I am aware of the "Protocol for Searching Devices or Media that Store Data Electronically" that has been adopted by the Court in the Northern District of California. I attest that the search and seizure of any electronic media shall be handled in accordance with the protocol set forth in Attachment C, incorporated here by reference.

<u>**Request Approval for Assistance from Private Parties**</u>

83.     I expect that the amount of stolen merchandise that would be recovered upon the execution of the requested search warrants will be substantial. For example, in a similar search warrant

BARG AFFIDAVIT (LE)                          -23-

executed in Oakland in February of 2007 (Docket No. 4-07-70093 WDB), I am told that 235 pallets were recovered. The volume filled twelve full-size tractor trailers. The process of inventorying this volume of material would be extremely time-consuming for the agents, who would have to count and catalogue each item seized piece by piece. Investigators from a number of retail victims have offered to assist with the inventory process. They have offered to provide personnel, familiar with the inventory and labeling methods of each store, to assist both in (1) cataloging and valuing the items seized, and (2) identifying any items that belong to their chains.

84.     Such assistance would of course be extremely useful to the agents executing the search warrant. In addition, it would enable the victim companies to recover those items that could be identified as having been stolen from them. I therefore request that this Court authorize private store personnel to assist law enforcement in preparing the inventory of items seized pursuant to these search warrants. No private party would be involved in the initial entry into the search locations. Rather, those personnel would be kept at a safe distance until each search location had been secured by law enforcement officers. Only after a particular search location had been secured, and property identified that it would be beneficial to have the assistance of store personnel in inventorying, would such private parties be summoned to the scene. Any and all private persons assisting at the scene would do so only under the direct supervision of a law enforcement officer.

## Conclusion

85.     Based on my observations I respectfully submit that there is probable cause to believe that the subjects named in Paragraph 1 of this affidavit are committing the offenses ascribed to each of them, and therefore respectfully request that warrants issue for their arrest. I further submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the commission of the foregoing offenses will be found at the locations particularly in Attachments A-1 and A-2. I therefore respectfully request a search warrant for those premises, authorizing agents to search for and seize the evidence, fruits, and instrumentalities described in Attachment B.

//

//

//

//

//

//

//

BARG AFFIDAVIT (LE)                    -24-

**Request for Sealing**

86.     As this investigation is continuing, disclosure of the arrest warrants, search warrants, seizure warrants, this affidavit, or this application and the attachments thereto could jeopardize the progress of the investigation. Such disclosure would give the subjects an opportunity to cease their criminal activities, destroy evidence, notify confederates, and otherwise interfere with the investigation. Accordingly, I request that the Court issue an order that the arrest and search warrants, this affidavit in support of application for search warrant, the application for search warrant, and all attachments thereto be filed under seal until further order of this Court.

JOHN L. BARG
Task Force Agent, FBI

Subscribed and sworn to before me

this _2_ day of June 2008

PATRICIA V. TRUMBULL
United States Magistrate Judge

BARG AFFIDAVIT (LE)                    -25-